164 N.J. Super. 563 (1978)
397 A.2d 384
GLENVIEW DEVELOPMENT CO., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
FRANKLIN TOWNSHIP, PLANNING BOARD AND ENVIRONMENTAL COMMISSION OF FRANKLIN TOWNSHIP, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided December 18, 1978.
*564 Mr. Robert J. Benbrook for plaintiff Glenview Development Co. (Messrs. Morrow & Benbrook, attorneys).
Mr. Richard G. O'Brien for defendants Franklin Township, Franklin Township Planning Board and Environmental *565 Commission of Franklin Township (Messrs. Bowers, Rinehart, Murphy & O'Brien, attorneys).
D'ANNUNZIO, J.S.C.
Plaintiff corporation, a land developer, owns approximately 240 acres in the Township of Franklin, Hunterdon County, currently zoned for three-acre, single-family residential lots. It would like to develop its lands at a much higher density (see section III of this opinion) and attacks Franklin's zoning ordinance on three grounds. Its first attack is based on South Burlington Cty. NAACP v. Mt. Laurel Tp., 67 N.J. 151 (1975), app. dism. and cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1978), and Oakwood at Madison, 72 N.J. 481 (1977). It contends that Franklin Township is a developing municipality within the meaning of those decisions, and therefore it must rezone to accommodate a variety of housing alternatives which its zoning ordinance currently precludes. Its second attack appears to be a variation of the Mt. Laurel approach without relying on Mt. Laurel. The cornerstone of this attack is the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq.; plaintiff contending that Franklin's current zoning violates the purposes of this act and therefore must fall. Plaintiff Glenview's third attack is more traditional: it contends that the Franklin zoning ordinance, as applied to its particular property, precludes any reasonable economic use of that property and therefore its lands must be rezoned.

I. Applicability of Mt. Laurel
The principles of Mt. Laurel do not apply to all New Jersey municipalities. They do not apply to developed municipalities, Pascack Ass'n, Limited v. Washington Tp., 74 N.J. 470 (1977), or to rural municipalities which are not developing municipalities, Mt. Laurel, 67 N.J. at 160. Mt. Laurel established certain express criteria and some implied criteria for determining whether a municipality is or is not developing. A significant part of the testimony and evidence *566 introduced by each side focused on how Franklin Township did or did not meet the criteria. Most of the material facts bearing on this issue are not in dispute, although each side differs in the emphasis to be given, the inferences to be drawn and the characterizations to be made. The undisputed material facts create the following picture.
Franklin Township is situate approximately 45 miles west of Newark, 17 miles west of Somerville and 35 miles north of Trenton. It is 18 miles east of Pennsylvania. Its 22 square miles contain a population estimated to be approximately 2,300 in 1976. In 1950 its population was 1,255 and in 1970, 2,154. Its population density of 100 per square mile is the 55th lowest out of 567 municipalities and, in absolute numbers, it is the 100th lowest. Mt. Laurel Township's density in 1970 was 665 per square mile based on a population of 11,221, and Madison Township's population of 48,630 in 1975 yielded a density of 1,269 per square mile.
Franklin's population is typical of the Hunterdon County municipalities which adjoin it. Those municipalities and their 1975 estimated population are: Alexandria Township, 2.290; the Town of Clinton, 2,050; the Township of Clinton, 6,200; Union Township, 2,570; Raritan Township, 8,350; Kingwood Township, 2,480. Hunterdon County's estimated 1975 population is 75,000, contained in an area of 437 square miles.
Approximately 72% of Franklin Township land is devoted to agriculture. This is the highest percentage of any municipality in Hunterdon County. The Township ranks 20th in the State in land devoted to agricultural use. Only 1% of the land is devoted to industrial use and 1.7% to commercial uses.
Franklin's zoning ordinance allows for two residential zones  a three-acre zone and a five-acre zone. The three-acre zone constitutes about 80% of the residentially zoned land. At the time of trial there was no industrial zone in *567 the township, and the ordinance provided for only limited commercial and business zones. Defendant's expert, Professor Rose, testified that total industrial employment in Franklin constitutes 22 jobs.
There are approximately 700 residences in Franklin, 200 of which were characterized as farm homesteads by Professor Rose. The township has two food markets, one a large supermarket, the other a smaller neighborhood type outlet. There are two garages, five churches and one tavern. The township's road system is limited, consisting of 2.58 linear miles per square mile as compared to the state mean of 10.24 linear miles and median of 9.18 linear miles. Mt. Laurel had 4.65 and Madison 4.33. There is neither a public sewer nor public water system within the township, though both utilities exist in the neighboring Town of Clinton. There is one public elementary school and one volunteer fire department within the township.
Defendant introduced testimony and evidence to establish the geological characteristics of the township. Seever, a ground water geologist, established by his testimony that the township's geology results in severe limitations in terms of water yield for domestic use and in terms of sewage disposal by individual septic systems. Plaintiff did not contest Seever's testimony or findings. Its position is that any high density development will require centralized public water and sewerage systems and that such systems are available to its property by a potential hook-up with the utilities located in the Town of Clinton to which plaintiff's lands are contiguous.
Early in its Mt. Laurel opinion the Supreme Court described the type of municipality to which its decision was directed. In so doing it articulated what commentators have described as the six criteria of a developing municipality. A developing municipality (1) has a sizeable land area, (2) lies outside the central cities and older built-up suburbs, (3) has substantially shed rural characteristics, (4) has undergone great population increase since World War II or is now in the process of doing so, (5) is not completely developed *568 and (6) is in the path of inevitable future residential, commercial and industrial demand and growth. 67 N.J. 160.
In the same paragraph which contains these criteria the court also said that its decision was not concerned with "central cities or older built-up suburbs or areas still rural and likely to continue to be for some time yet."
The parties' experts have seized upon these criteria for their presentations, which were designed to show how Franklin met, or did not meet, the Mt. Laurel tests.
Certain facts are obvious. Franklin Township has a sizeable land area and is not completely developed. It has not undergone great population increase since World War II and is not now in the process of doing so. With regard to the population increase, plaintiff argued that the reason Franklin has not undergone great population increase is because of the restrictive zoning. There is some merit to plaintiffs argument; however, Franklin's population growth is not out of line with most of its adjoining municipalities and is not out of line with the population density of the county as a whole. The county's overall density is approximately 171 persons per square mile; Franklin's density is approximately 100 per square mile.
Furthermore, its low population is not at odds with what one would expect from a community in which 72% of its land is devoted to agriculture. Location may also have been a factor in limiting population growth. The court notes that other municipalities situated east of Franklin and closer to the heavily populated areas of the State have grown somewhat faster than Franklin despite large lot zoning, e.g., Tewksbury, Clinton and Readington Townships in Hunterdon County and Bernards Township in Somerset County. The court finds that Franklin's limited population and growth cannot be explained exclusively as a function of large lot zoning. See the discussion infra regarding the criteria of inevitable growth.
With regard to whether Franklin has substantially shed its rural characteristics, plaintiff does not contend that the *569 entire township has shed its rural characteristics. Plaintiff's expert, Moskowitz, conceded that a substantial part of Franklin must be considered rural but that the area in which his client's property is located has shed its rural characteristics because it is near the "appurtenances of urban development." Moskowitz bases his conclusion on the fact that the Town of Clinton, which adjoins plaintiff's property, has public sewers and public water, as well as on the fact that the property is near an interchange of Interstate Route 78. According to Moskowitz, other appurtenances of urban development are the Laneco Shopping Center, which is in Franklin and adjoins plaintiff's property, and the existence of two large employment centers, to wit, the Hunterdon State School and the Clinton Correctional Institute for Women, both of which are located in adjoining Union Township. The court does not find Moskowitz's testimony on this score very persuasive. Faced with Franklin's low population density, vast amounts of open land, most of which is devoted to agriculture, Moskowitz focused on the characteristics of adjoining municipalities to conclude that only a portion of Franklin, and, indeed, the portion in which his client's property is located, has shed its rural characteristics. The only factor upon which the witness' conclusion rests and which is physically located in Franklin is the Laneco Shopping Center, which contains a general merchandise and grocery discount operation, plus a handful of satellite stores.
This court finds as a fact, based upon its population, land use and lack of an adequate capital infrastructure, i.e., roads and other public facilities and services, that Franklin Township has not shed its rural characteristics.
Criterion number two is that the municipality be "outside the central cities and older built-up suburbs of our North and South Jersey Metropolitan areas (and surrounding some of the smaller cities outside those areas, as well) * * *." The plaintiff's view is that since Franklin is not a central city or older built-up suburb, it is "outside" those described municipalities, and, therefore, the second criterion is met. Defendant's *570 view is more limited, it takes the position that by using the term "outside," the Supreme Court meant municipalities which were neither central cities nor older built-up suburbs but were in close proximity thereto. The court neither wholly agrees nor wholly disagrees with either position. Obviously, the Mt. Laurel principles are not applicable to the central cities or older built-up suburbs. However, that is not to say that all municipalities which are not central cities or older suburbs meet criterion number two, as contended by plaintiff. The court also rejects defendant's contention that this criterion requires close proximity to central cities. What is required is some reasonable geographic relationship between the alleged developing municipality and those areas which, because of their location, population or substantial economic activity generate a need or a demand for housing; such areas are not necessarily limited to central cities or older suburbs.
The court finds that Franklin bears a reasonable geographic relationship to areas of substantial economic activity which generate employment and demand for housing. It is within reasonable commuting distance of Trenton, Somerville, New Brunswick, Piscataway and the Plainfields. Criterion number two, therefore, is also met.
The remaining express criterion is whether Franklin is in the path of inevitable future growth. Defendant's witness contends that it is not. Historically, he contends, growth in New Jersey has been along a northeast to southwest corridor between New York City and Philadelphia. Franklin lies outside that corridor. Furthermore, defendant contends, growth in New Jersey is not necessarily inevitable. The testimony of plaintiff's witness, Moskowitz, tends to support the last point. He conceded on cross-examination that there has been a slowdown of growth in the Hunterdon County area which he attributed to general economic conditions, the energy situation and "smart municipalities." However, he also agreed that New Jersey, along with the rest of the northeast, was losing manufacturing employment and that the most recent figures indicated *571 that New Jersey's population, as a whole, had stopped growing. Nevertheless, the evidence, particularly the various housing statistics introduced into evidence, compel a conclusion that the North Hunterdon area, particularly along the I-78 corridor, and including Franklin Township, would experience substantial residential growth and residential development, assuming availability of financing, and zoning and planning controls which would be attractive to developers. However, the same evidence compels the inference that much of this growth would be relocation growth from within other areas of the State. To that limited extent, therefore, the criterion of inevitable growth would seem to have been met.
Accordingly, the criteria score is four to two; that is, four of the Mt. Laurel criteria have been met, resulting in an apparent victory for plaintiff. However, I do not believe the Supreme Court intended that its criteria were to be used as so much litmus paper. Application of Mt. Laurel requires the exercise of judgment, not merely a calculation. The express criteria found in that opinion provide an analytical framework; they are factors to be considered and, in a given situation, one of these factors may be much more significant than the others.
By any definition, Franklin is a rural community of low population with no major employment centers, no industry, no capital infrastructure, but with a dedication of most of its lands to agriculture. To be sure, it is on the threshold of change, and what applies to it now may not be applicable in ten or even five years. But while it is on the threshold, it has not yet crossed that threshold.
One of the evils which Mt. Laurel sought to remedy was so-called fiscal zoning, i.e., zoning for and attracting industrial and commercial ratables, while at the same time excluding from residence within the community all but a few of the persons employed in these facilities. Franklin has not been guilty of this practice. It currently has no industrial zone, and its total industrial employment is 22. Its *572 commercial zone is minimal, and its largest commercial project is a small semi-regional shopping center.
Franklin's zoning is consistent with the general area in which it is located, which is one of generally low density population. The special character of this area is illustrated by reference to Exhibits D-6 and D-8, which physically present the population distribution and population density of the State by superimposing on a map of New Jersey and its municipalities the population characteristics of each municipality expressed in terms of white for low population, gray for moderate and black for high. These exhibits dramatically reinforce the impression of even the most casual observer of New Jersey's geographic, demographic and economic characteristics: that the greatest activity lies on an axis which runs from New York City to Philadelphia on a northeast to southwest bearing. The exhibits also reveal that two distinct areas in the State exist which continue to be characterized as low population areas  the so-called Pine Barrens of Ocean, Burlington and Atlantic Counties (to which can be added the agricultural lands of Gloucester and Salem Counties), and the northwest quadrant of the State consisting of Hunterdon, Warren and Sussex Counties. In a State which has been characterized as the most urbanized in the nation, these two readily identifiable areas are truly unique in that they continue to be low in population, rich in natural beauty, significant ecologically and agriculturally and rural in atmosphere and outlook. It is not likely that the Mt. Laurel principles were intended by the Supreme Court to apply to municipalities located in the northwest quadrant, such as Franklin Township, and which continue to be rural, absent some special circumstances. (See 67 N.J. at 160, and footnote 7 of Justice Pashman's concurring opinion at 67 N.J. 200, where he characterized certain municipalities as being "distant from the path of development and rural in character." Of the six municipalities so characterized by Justice Pashman, four are in, or on the fringes of, the South Jersey Pine Barrens and two are in the northwest *573 quadrant. The four southern municipalities had 1975 populations ranging from 4,540 to 17,106, with a density range of 111 to 372. The two northwest townships of Montague (Sussex) and Allamuchy (Warren) had populations of 1,800 and 1,284 in 1975, with densities of 39 and 63. Exhibit D-11.)
The inappropriateness of applying the Mt. Laurel principle to rural northwest quadrant municipalities, absent some special circumstances, and to Franklin Township in particular, is supported by the State Development Guide Plan, Preliminary Draft (September 1977). The plan, drafted by the Division of State and Regional Planning of the New Jersey Department of Community Affairs, was admitted into evidence as a joint exhibit, JE-1. It makes several points which are relevant to the case at hand.
The Plan recognizes the need to protect the State's natural resources and places special emphasis on the preservation of agriculture and agricultural lands. At page 25 it states:
Since 1950, the quantity of agricultural land has decreased from 1.7 million acres to 1.1 million acres. The gentle topography of farmlands is well suited to residential development; and scenic areas, particularly along water courses, provide attractive settings for houses. Even very low density development tends to intrude, interfering with adjacent agricultural activities and with the sense of openness.
The challenge in future years will be to protect key natural resources including agricultural lands which provide benefits to all New Jerseyans, regardless of location. As the State expands in population and economic activity, the possibility of irreversible environmental damage and the loss of irretrievable resources increases. Land used for housing and shopping centers cannot later be used for reservoirs and wildlife preserves. Land used for factories and highways cannot also be used for parks and agriculture. We need to protect and use such resources wisely as the State's population continues to grow. [at 25]
The Plan proposed to implement this policy with regard to agriculture by identifying those areas of the State particularly suited to agriculture due to the existence of favorable soils and the large units of undeveloped land necessary *574 for the application of modern farming techniques. The map produced at page 40 of the Plan identifies "Prime Open Agricultural Lands." A very significant proportion of such lands are in the northwest quadrant and most of those lands are in Hunterdon County. All of Franklin Township is so classified.
The Plan also identifies (at 42) steep slope areas where, in its opinion, development should be discouraged. The map at 43 shows a significant concentration of steep slope areas in the northwest quadrant reaching into northern Hunterdon County.
The Plan recommends that the undeveloped areas of the State be divided into four groups: (1) growth areas, (2) limited growth areas, (3) agricultural areas and (4) open space. One of the Plan's conclusions is that there is enough land in the growth areas to accommodate most of the State's development into the next century. (The Plan, at 25, states that New Jersey's 7.3 million people occupy only 30% of its land area.)
The Concept Map, which is a visual illustration of the Plan's development recommendations, very clearly and unequivocally places the great proportion of northwest quadrant lands in with the agricultural area or the limited growth area. Franklin Township is quite definitely entirely placed in the agricultural area, evidently due to its favorable soils and current agricultural use.
An implied but significant conclusion of the Plan is that the limited growth areas and the areas proposed to be preserved for agriculture, such as Franklin Township, are not necessary to accommodate future residential growth or development, at least to the end of this century; therefore, preservation of those areas will not preclude the attainment of legitimate housing goals or the economic and social health of the State.
Indeed, it can be cogently argued that high density development of the northwest quadrant would adversely affect the social health of the State by interfering with attempts *575 to revitalize our urban areas, which is one of the goals of the Plan. (See text at pages 18 and 34 of the Plan.) Significantly, urban revitalization is the primary goal of the second Byrne administration. Governor Byrne made that goal the keynote of his 1978 inaugural address wherein he stated:
While we can never recapture the cities of our youth, we can build on each of the unique characteristics of our urban centers today. We can begin with the help of business and industry to remake the cities in a new image.
Why can't we actively encourage population growth and investment in the cities and deliberately discourage growth of unspoiled lands?
To this end, my second administration will invest its capital and structure its policies to make urban living more attractive. We can do this by deciding where and where not to build sewage systems, roads and public works and regional facilities; where and when not to direct housing investment, economic development projects, revenue sharing and tax incentives; where and when not to invest the time and talent of our state officials.
[The New York Times, Wednesday, January 18, 1978. Section B, page 3.]
If the hypothesis that low-income housing cannot be built without government subsidy is accepted, high density development of the northwest counties will be in the form of housing for moderate, middle and upper middle-income families. (Plaintiff's expert's proposal for the development of its Franklin tract would include some low and moderate-income units if governmental assistance were available. Moskowitz conceded that the majority of the units in his proposals would not be low or moderate-income units.) Although hard statistics were not introduced and perhaps are not available, it can be argued that a substantial number of the occupants of such units will have relocated from either the urban areas of the State or from the inner suburbs which ring those urban areas. In short, the lowering of barriers to high-density development in the rural and semi-rural areas of the State would probably promote and encourage movement *576 of the white middle class from the traditional urban centers and their surrounding suburbs. A continuation and aggravation of that movement would tend to exacerbate currently existing social and economic divisions and would probably severely hamper an urban renaissance.
The Plan is not law. But it is the product of objective analysis on a statewide basis. The fact that Franklin's land use policy is consistent with the Plan is a very strong indicia of the reasonableness of that policy as expressed in its zoning ordinance. The Plan also provides an express state policy which supports the Supreme Court's exemption of rural areas from the dictates of Mt. Laurel.
For the reasons set forth above, this court concludes that Franklin Township is not, at this time, a developing municipality, but rather, is a rural municipality to which the principles of Mt. Laurel are not presently applicable.
Since this court has found that Franklin is not a developing municipality, the obligation to provide a cross-section of housing opportunities imposed by Mt. Laurel is not applicable. Nevertheless, some comment regarding the housing need within Franklin is appropriate. Plaintiff contends that there exists in Franklin a need for 85 low income housing units, Exhibit JE-3, Hunterdon County Planning Board Master Plan Report No. 22 supports this contention. That document also defines the need. It does not constitute a finding that 85 Franklin families lack shelter. Rather, it is a statistical guess based on the existence of a certain number of families with incomes below a given level, combined with a finding that there are a certain number of substandard dwelling units (as defined therein) in Franklin, as well as certain other assumptions. See appendix 10 of JE-3, which describes the statistical formula. For the purposes of this opinion, this court will assume the existence of this need. This court, however, fails to see any real relationship between that need and this litigation.
Plaintiff's expert testified that low-income housing could not be built without government subsidy. He also outlined *577 two proposals for the development of his client's lands which, in his opinion, were economically feasible. (See part III of this opinion). His proposals would no more meet the need for low-income housing in Franklin than would development under the current zoning. Mt. Laurel was designed to open the door to housing for those in the lower portions of the economic spectrum. Unfortunately, its principles are being utilized as leverage to break down impediments to high density developments which do not serve, and probably cannot serve, the interests promoted by that landmark decision. See Pascack Ass'n, Ltd. v. Washington Tp., 74 N.J. 470 (1977). Accordingly, a decision in favor of plaintiff in this case would result in judicial override of a local legislative decision, in a context which could lead to the rapid and ultimately irreversible intense development of a community which is currently rural and predominantly agricultural, without, however, accomplishing Mt. Laurel's ends.
This court is also aware that continued development of Franklin into three-acre residential lots may, in the long run, destroy its rural flavor and its agriculture as effectively as high-density development. Solution of that dilemma is beyond the power of this or any other court and will require imagination and creativity at the local level and probably new approaches to land use control and planning from State Government.

II. Alleged Violation of the Enabling Act
Glenview contends that Franklin's ordinance is invalid because it does not serve the purposes of zoning as set forth in the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. Plaintiff specifically refers to N.J.S.A. 40:55D-2(a), (d) and (e). They provide as follows:
a. To encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare;

*578 * * * * * * * *
d. To ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole;
e. To promote the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities and regions and preservation of the environment.
Citation of these sections adds nothing to plaintiff's case. Whether, how and to what extent the purposes of the act, as expressed in subsection (a), (d) and (e), are effectuated is a decision reserved to each municipality, subject to judicial review at which time the municipality's decision must be upheld unless it is found to be arbitrary or unreasonable. Pascack Ass'n, Ltd. v. Washington Tp., 74 N.J. 470 (1977); Swiss Village Assocs. v. Wayne Tp., 162 N.J. Super. 138 (App. Div. 1978).
Reliance on the cited sections really begs the question and appears to be an attempt to reassert the principles of Mt. Laurel without relying on Mt. Laurel and its limitations. As such, and for the reasons expressed in Part I of this opinion, the plaintiff's argument is rejected.

III. Economic Utility of Plaintiff's Lands
Plaintiff contends that the three-acre residential zone renders his lands economically useless, and therefore the ordinance as applied to his property is invalid. Plaintiff purchased the tract in question, including lands in the neighboring Town of Clinton, in 1967. It was zoned three-acres residential at that time. The total area was 301 acres.
Robert McEldowney, a professional engineer, testified on behalf of plaintiff. A map prepared by his firm was introduced into evidence as P-4. It showed plaintiff's lands, including the Town of Clinton piece as well as some other adjoining properties and features. McEldowney testified that 54 acres are located in the Town of Clinton in an industrial zone located to the north of, and contiguous with, plaintiff's *579 Franklin properties. The Franklin property consists of 242 acres, which is bisected by a railroad track. The land east of the railroad, consisting of 68 acres, has severe developmental limitations. It lies between the railroad track and the South Branch of the Raritan River. It has access problems and a substantial part of it, but not all of it, is in a flood hazard area. The balance of the Franklin property consists of approximately 174 developable acres west of the railroad. It is bounded on the west by the Clinton-Sidney Road, with a frontage on that road of approximately 1,500 feet.
McEldowney testified that he was consulted by plaintiff for the purpose of testifying in this matter. As part of his responsibility he prepared the map referred to as P-4, which contains thereon a proposed subdivision of the 174 developable acres in Franklin Township. According to McEldowney, the proposed subdivision is, in his opinion, the optimum subdivision plan for this particular property under the existing zoning ordinance. The plan resulted in the creation of 49 lots, all of which conformed to the minimum requirements of the zoning ordinance. Some of the lots are, in fact, in excess of the minimum three-acre requirement. The subdivision prepared by McEldowney contained 10,300 lineal feet of new streets. Access to the subdivision is from the Clinton-Sidney Road frontage and also from a road located in the Town of Clinton. The 10,300 feet of roads includes 2,000 feet in the Clinton industrial zone, which contains none of the 49 residential lots.
McEldowney testified that the improvements required by the subdivision ordinance of Franklin Township, including the new streets, would cost $72 a lineal foot of road, or $742,000 for 10,300 feet of road. The estimated cost of improvements would calculate to $15,000 a lot. However, if the 2,000 feet of road in Clinton are eliminated, then the cost of the improvements per lot would be $12,000. One-hundred thousand dollars of McEldowney's figures included miscellaneous and contingencies. He also conceded that his estimate might change if plaintiff did its own *580 work rather than contracting out the construction of the improvements.
Defendant introduced no evidence to contradict McEldowney's testimony. However, the court is not convinced that the 2,000 feet of road in the Town of Clinton is really necessary to develop plaintiff's Franklin lands. While McEldowney testified that from a planning point of view it was preferable to have the second access, this court finds as a fact that plaintiff has not proved that the second access is necessary, or that the expense of the 2,000 feet of roadway in its industrial zone should be considered as a legitimate expense of the preparation of its Franklin lands for the sale of residential lots. Accordingly, the court accepts McEldowney's amount of $12,000 as an improvement cost per lot rather than the $15,000. The court knows that in so doing, plaintiff is being given the benefit of the doubt with regard to the $100,000. of miscellaneous items and contingencies, although the testimony with regard to those two items was somewhat weak.
McEldowney's proposal did not include development of the area east of the railroad, and the court finds as a fact based upon his testimony that development of that area would be impractical because of its access problems and because of the limitations imposed by its proximity to the Raritan River flood plain.
Plaintiff also introduced the testimony of Clarence Blazure, a local realtor, who had prepared a marketing analysis consisting of sales in Franklin Township and other neighboring Hunterdon communities in 1976 and 1977. Exhibit P-6. Mr. Blazure concluded that there is a strong demand for housing in the Clinton-Franklin Township area, particularly in the $50-60,000 category. In his opinion, housing in that price range cannot be built in Franklin Township because of the limitations of its zoning and subdivision ordinances. Blazure analyzed the various factors which go into the pricing of a single-family home on newly developed three-acre residential lots and concluded that such a project, to be *581 economically viable, would require a price per house and lot ranging from $90,000 to $103,000. He testified that plaintiff would be unable to sell houses at that price on that particular property because it was next to (a) an industrial zone, (b) a noisy interstate highway, (c) a correctional institution, (d) a state hospital for mentally retarded children, (e) a large shopping center, and (f) next to a railroad.
The court notes that plaintiff does not contend that there is a lack of effective demand for homes in the $100,000 category, nor could plaintiff make such a contention. Blazure's marketing analysis indicates that, in 1976 and 1977, 24% of the homes sold in Franklin Township sold for over $100,000 and that 40% of them sold for over $80,000. Furthermore, Franklin Township Tax Assessor Schmid testified and introduced into evidence as D-5, a statistical study of lot sales in Franklin Township during 1977 and 1978. These lots were vacant lots without houses. Of the 12 lots sold in 1977, ten sold for $25,000 or more, with one selling for $45,000. Of the 15 lots sold in 1978, six, or 40% sold for $30,000 or more, and seven sold for between $25,000 and $30,000. Accordingly, the court finds as a fact that there is an existing effective demand for lots and houses in the price range at which plaintiff would have to sell lots and houses under current zoning limitations.
The isolated issue, therefore, is whether plaintiff's lands are so situated, physically and geographically, that a person willing and able to pay $30,000 for a lot or $100,000 for a home would not make such an investment in a lot or home on plaintiff's Franklin Township lands.
With regard to the proximity of the Franklin lands to Interstate Route 78, P-4 clearly establishes that the highway is at least 2,000 feet from the closest perimeter of those lands. Furthermore, plaintiff introduced no evidence, other than Blazure's characterization of the highway as noisy, with regard to any measure of noise produced by traffic on that particular road and which would be heard by residents on plaintiff's Franklin lands.
*582 There is a railway track in the easterly portion of the tract, and according to McEldowney's design, this railroad track forms the boundary between the developable lands on the west and the nondevelopable lands on the east. Pursuant to his design as shown on P-4, the track will adjoin the rear of eight of the proposed lots. As such, the track is at least 500 feet from the road upon which each of the eight lots will front. No evidence was introduced as to whether, in fact, this particular track is ever used and, if so, the frequency or infrequency of such use. Furthermore, as a countervailing factor, purchasers of those particular lots, while running the risk of the noise of a possible passing train, would also enjoy the probability that the lands east of the railroad track would never be developed but would remain in their natural state.
Plaintiff introduced into evidence as P-7 an aerial photograph of its lands and surrounding vicinity. That photograph shows the Clinton Reformatory for Women and the State Hospital for Retarded Children. Those institutions are located in neighboring Union Township and from the photo appear to be approximately a half-mile from the northwesterly corner of the Franklin lands. McEldowney's map, P-4, corroborates those approximate distances.
P-4 also graphically portrays the topography of plaintiff's lands by way of contour lines. Those lines indicate that the developable lands in Franklin, when viewed from the northwest corner  that is, from the intersection of the northern perimeter with the Clinton-Sidney Road  are almost bowl-shaped. The frontage along the Clinton-Sidney Road, the westerly perimeter, is much higher than the developable lands adjacent to the railroad track. Specifically, the lands along the frontage have an elevation of 280 to 340 feet. From there the lands slope down until the elevation at or about the railroad track is approximately 180 feet. The elevation of the northern perimeter ranges from 340 feet at the Clinton-Sidney Road to a low of 220 feet. From that northern perimeter the land then drops off into the *583 valley to a low of approximately 180 feet at the railroad track. In effect, the northern perimeter and the western perimeter are ridges which isolate plaintiff's lands from the small commercial area which adjoins it on the north and which includes the Laneco Shopping Center, and also isolates it from Route 78 and the development north of Route 78 in the Town of Clinton, including the Correctional Institution and the State Hospital. The lands to the west of the Clinton-Sidney Road and to the south of plaintiff's proposed development are rolling, open farmland.
Plaintiff also complains about the existing industrial zone in the Town of Clinton contiguous to its developable Franklin lands. This industrial zone is also owned by plaintiff. It is vacant land and has remained vacant for a long period of time, despite the fact that it has been zoned industrial for at least a decade. Indeed, plaintiff's president testified that it had made several attempts to develop that industrial property, but none was successful. To the extent that the existing industrial zone may present a marketing problem with regard to some of the developable Franklin land, plaintiff is in a premier position to provide a buffer between the industrial rezoned land in Clinton and his proposed residential development.
Certain of the plaintiff's other evidence appears to be inconsistent with its claim that the property is currently zoned into economic uselessness. Blazure testified that he valued the plaintiff's lands at $3,000 an acre. Plaintiff's purchase price was approximately $1,100 an acre. It is hard to believe that lands which could command $3,000 an acre on the open market are economically useless.
Furthermore, as part of its presentation plaintiff's planner, Moskowitz, presented some general ideas as to how his client's property could be developed if the current zoning were invalidated. Those proposals are graphically illustrated in Exhibits P-10 and P-11. These proposals involved a mix of townhouses, condominiums and single-family units. One proposal would also include an intermingling of commercial *584 uses. Moskowitz candidly conceded that the majority of these units would not be low or moderate-income units. In fact, as the court recalls his testimony, he also conceded that low and moderate-income units could not be built without some form of governmental subsidy or assistance. He anticipated the price of many of the units as being from $55,000 to $60,000. There was no testimony as to the anticipated price of the single-family homes. The court does note, however, that Moskowitz's proposals place some condominium units and a cluster of single-family homes as close to the railroad track as some single-family homes would be under McEldowney's conventional subdivision plan.
At the termination of the testimony both parties invited the court to make a physical inspection of plaintiff's lands. The court did so to better understand the evidence but not for the purpose of making independent findings based on the inspection. Morris Cty. Land v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963). After the physical inspection the attorney for plaintiff asked the court to take judicial notice of certain characteristics of the property and its environs. The court will refrain from so doing and will limit the physical inspection to the establishment of a better understanding of the evidence. In that vein, the court notes that its physical inspection of the property confirmed the topographical characteristics revealed in P-4  that is, that the property is high and ridge-like on its northern perimeter and along the Clinton-Sidney Road frontage, and from there slopes down to the railroad tracks. The inspection also confirmed the fact as demonstrated by P-4 and P-7 that those two ridges serve to isolate the property from the commercial area and shopping center immediately to the north. The inspection also confirmed the distance of the Correctional Institution and the State Hospital and further confirmed the inference to be drawn from the aerial map, P-7, that those institutions were so situated physically as not to constitute a visually disturbing image. Of course, the court has no way of measuring or gauging what psychological impact the existence of those institutions *585 may have on a prospective purchaser of a home. It is likely that some prospective purchasers will be disturbed. It is also equally likely that some prospective purchasers won't care.
The standards of judicial review of a zoning ordinance were cogently expressed in Bow & Arrow Manor v. West Orange, 63 N.J. 335 (1973):
It is fundamental that zoning is a municipal legislative function, beyond the purview of interference by the courts unless an ordinance is seen in whole or in application to any particular property to be clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the statute. N.J.S.A. 40:55-31, 32. It is commonplace in municipal planning and zoning that there is frequently, and certainly here, a variety of possible zoning plans, districts, boundaries, and use restriction classifications, any of which would represent a defensible exercise of the municipal legislative judgment. It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at a trial is at variance with the local legislative judgment. If the latter is at least debatable it is to be sustained. [at 343]
In that case several landowners mounted an attack on the zoning of their land which was very similar to the approach taken by plaintiff Glenview. The Supreme Court, applying the principles expressed above, reversed the trial court and the Appellate Division decisions sustaining the attack. The crux of the court's decision appears at page 345:
We are satisfied, without here detailing all of the extensive proofs, that the basic determination under appeal was in error because not giving due deference to the local legislative judgment in the matter. The situation presented does not mandate that all the Prospect Avenue frontage (much less the Riding Club) be zoned for general commercial uses or that residential zoning for that segment thereof north of Kruvant be proscribed. What we have here is a fairly disputable area where commercial influences converge with residential ones. The legislative judgment could reasonably go either way. It is for the governing body to decide the boundary lines for adjoining districts of discordant character.
*586 In the case at bar plaintiff has not carried its heavy burden of proving that Franklin Township's ordinance, as applied to its property, deprives it of economic utility of its property. Plaintiff's contention that the ordinance is, therefore, arbitrary and unreasonable is rejected. What has been presented is a debatable question as to the appropriateness of the zoning as it affects plaintiff's tract. Being a debatable question, the local legislative judgment shall prevail.
Plaintiff's reliance on Schere v. Freehold Tp., 119 N.J. Super. 433 (App. Div. 1972), is misplaced. One basis for that decision was a complete lack of any proof to show a demand for the type of housing zoned. The court's view on this point was buttressed by the fact that little or no development on 40,000 square foot lots had occurred since that restriction was first adopted in 1965. The court also based its decision on an express finding that the specific purpose of that particular zoning restriction was to prevent utilization of the property for municipal fiscal reasons.
Plaintiff's reliance on the testimony of Tublitz, who had been a planning consultant for Franklin Township, is also misplaced. Looking at his testimony in a light most favorable to plaintiff, it was his opinion that plaintiff's tract was very appropriate for high-density development because of its location and proximity to the Town of Clinton's sewerage and water systems. What the plaintiff's arguments ignore is the fact that planners have no legislative authority. Zoning decisions are made by local legislative bodies and not by their consultants.
Judgment for defendant is to be entered in accordance with this opinion.