576 A.2d 819
JOHN G. VAN DALEN, ON HIS OWN BEHALF AND AS CO-TRUST-EE WITH JOHN P. CHESTER OF CHESTER AND VAN DALEN ASSOCIATES, INC. EMPLOYEES' RETIREMENT TRUST, AND CHESTER AND VAN DALEN ASSOCIATES, A NEW JERSEY PARTNERSHIP, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. WASHINGTON TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY LOCATED IN MORRIS COUNTY, NEW JERSEY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued March 26, 1990—Decided July 18, 1990.

*Alfred J. Villoresi* argued the cause for appellant and cross-respondent Washington Township (*Villoresi, Edwards and Jansen,* attorneys; *Debra K. Donnelly,* on the briefs).

*Donald M. Palombi,* Deputy Attorney General, argued the cause for appellant and cross-respondent Council on Affordable Housing (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel).

*Carl S. Bisgaier* argued the cause for respondents and cross-appellants (*Bisgaier & Pancotto,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This exclusionary-zoning case requires us to consider the use by the Council on Affordable Housing (COAH or Council) of the State Development Guide Plan (SDGP) in determining a munici-

pality's *Mount Laurel* obligation. The SDGP, compiled during the late 1970s and released in May 1980, is scheduled to be replaced by the State Development and Redevelopment Plan (SDRP) in 1993. *L.*1985, *c.* 398. Plaintiff, John G. Van Dalen, challenges the interim use of the SDGP in defendant, Washington Township (the Township), claiming that the "growth" area delineation in the municipality is inadequate and based on outdated information. Van Dalen seeks to expand the growth area and to increase the Township's "fair share" burden so that his property can be considered as a site for any additional *Mount Laurel* obligation. COAH granted substantive certification to the Township's housing element and fair-share plan, and denied the developer a builder's remedy.

The Appellate Division affirmed the denial of a builder's remedy but vacated the grant of substantive certification. 232 *N.J.Super.* 205, 556 *A.*2d 1247 (1989). The court reviewed "the history and limitations of the SDGP * * * " and concluded that Van Dalen should be given the opportunity to present evidence at a hearing concerning the size of the growth area and the SDGP's reliability as a planning tool. *Id.* at 211, 556 *A.*2d 1247.

We granted the Township's petition for certification, 117 *N.J.* 631, 569 *A.*2d 1333 (1989), and Van Dalen's cross-petition for certification addressed to his entitlement to a builder's remedy. 117 *N.J.* 632, 569 *A.*2d 1333 (1989).

We affirm so much of the Appellate Division judgment as denied Van Dalen a builder's remedy, but reverse the judgment to the extent that it vacated the Township's substantive certification and remanded for a hearing on the appropriateness of COAH's reliance on the SDGP.

I.

Van Dalen owns two parcels of land comprising approximately 127 acres in Washington Township. He applied for a permit to build multi-family dwellings on the property, including the construction of low- and moderate-income housing units. Be-

cause the intended use did not comply with the Township's zoning laws, Van Dalen applied for a variance. While that application was pending, we rendered our decision in *Southern Burlington County N.A.A.C.P. v. Mount Laurel,* 92 *N.J.* 158, 456 *A.*2d 390 (1983) (*Mount Laurel* II). The zoning board subsequently denied Van Dalen's application for a variance. In July 1983 Van Dalen commenced this litigation, claiming that the Township's land-use ordinances were unconstitutional and that he was entitled to a builder's remedy under *Mount Laurel* II.

The Law Division first concluded that a portion of the Township contained a "growth area" as designated in the SDGP. The court subsequently determined that the Township's total regional fair-share obligation was 227 units. 205 *N.J.Super.* 308, 332, 500 *A.*2d 776 (1984). In addition, the court held that the Township's zoning laws were invalid under the *Mount Laurel* doctrine because they "fail[ ] to provide a realistic opportunity for construction of the 227 housing units it is obliged to provide." *Id.* at 344, 500 *A.*2d 776. The court ordered the municipality to rezone within ninety days. *Id.* at 345, 500 *A.*2d 776.

In July 1985 the Legislature enacted the Fair Housing Act. *L.*1985, *c.* 222 (codified at *N.J.S.A.* 52:27D–301 to –329). The Fair Housing Act established the Council on Affordable Housing, *N.J.S.A.* 52:27D–305a, and gave the Council the responsibility for determining whether a municipality's proposed ordinances will satisfy its *Mount Laurel* obligation. The Township moved to transfer the case to COAH. *See N.J.S.A.* 52:27D–316(a).

In October 1985 the Law Division denied the transfer motion. Based on our subsequent holding in *Hills Dev. Co. v. Township of Bernards,* 103 *N.J.* 1, 510 *A.*2d 621 (1986), the court reconsidered its decision and transferred the case to COAH in April 1986. The Appellate Division affirmed, and we denied certification. 110 *N.J.* 162, 540 *A.*2d 164 (1988).

In January 1987 the Township filed its housing element[1] and fair-share plan with COAH. See *N.J.S.A.* 52:27D–309a. The plan sought to satisfy the Township's *Mount Laurel* obligation by zoning two sites for inclusionary development, neither owned by Van Dalen. The filing was considered a petition for substantive certification because of the Township's status as a court-transferred municipality. See *N.J.A.C.* 5:91–4.2. Van Dalen objected to the Township's plan, claiming that the size of the Township's growth area was understated by the SDGP, and that the Township's fair share of low- and moderate-income housing should be increased.

COAH initiated the Fair Housing Act's "mediation and review" process to resolve the dispute. See *N.J.S.A.* 52:27D–315. After mediation efforts proved unsuccessful, COAH transferred the matter to the Office of Administrative Law (OAL) as a contested case. See *N.J.S.A.* 52:27D–315c.

In July 1987 an Administrative Law Judge (ALJ) rendered an initial decision denying Van Dalen's request for a builder's remedy. The matter was transferred back to COAH on August 19, 1987, for final disposition. COAH informed Van Dalen that it would "not entertain arguments regarding the extent of the growth area as established in the [SDGP] * * *." The Council stated that it would, however, hear testimony concerning any computational error "involving the accuracy of the local growth acreage measurement * * *." Van Dalen also sought a builder's remedy from COAH but was denied relief in January 1988.

COAH granted the Township's petition for substantive certification in February 1988. The plan provided for the inclusionary development of a five-hundred-acre site that did not include Van Dalen's land.

---

[1]A "housing element" means that portion of a municipality's master plan, consisting of reports, statements, proposals, maps, diagrams and texts, designed to meet the municipality's fair share of its region's present and prospective housing needs, particularly with regard to low- and moderate-income housing. *N.J.A.C.* 5:91–1.2.

The Appellate Division affirmed the denial of a builder's remedy, but reversed and remanded the matter to COAH to determine whether the SDGP could conclusively establish the extent of a municipality's growth area:

> We are satisfied that plaintiff does not assail the reasonableness of COAH's determination to utilize the SDGP, so long as it is treated as only one factor among others in its allocation methodology. In plaintiff's words, however, what is at issue is 'COAH's rigidity in not permitting any party to challenge the reasonableness of a particular SDGP designation as applied to a given municipality.' * * * From our review of the history and limitations of the SDGP as perceived by the Supreme Court, we have no doubt that plaintiff should be allowed an opportunity to question its reliability as a planning tool in this particular instance. Factual questions concerning delineation of defendant's growth area are projected herein which require resolution either by mediation or by COAH after adjudication in the Office of Administrative Law. [232 *N.J.Super.* at 211, 556 *A.*2d 1247 (citation omitted).]

## II.

In *Burlington County N.A.A.C.P. v. Mount Laurel*, 67 *N.J.* 151, 336 *A.*2d 713 (1975) (*Mount Laurel* I), we considered whether a municipality's land-use regulations were invalid because they did not provide a realistic opportunity for low- and moderate-income housing. We held that an exclusionary zoning ordinance was unconstitutional because it was "presumptively contrary to the general welfare and outside the intended scope of the [Township's] zoning power * * *." *Id.* at 185, 336 *A.*2d 713.

To satisfy the constitutional mandate, municipalities were required to consider the housing needs of their own citizens, as well as those of the municipalities' regions as a whole. We determined that a "developing" municipality, such as Mount Laurel, "must, by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for *all* categories of people who may desire to live there * * *." *Id.* at 187, 336 *A.*2d 713 (emphasis added). A municipality had to satisfy six criteria before it would be classified as "developing":

(1) The municipality must have a sizeable land area;

(2) lying outside the central cities and older built-up suburbs;

(3) which has substantially shed rural characteristics;

(4) having undergone great population increase since World War II or is now in the process of doing so;

(5) the municipality is not completely developed; and

(6) the municipality is in the path of inevitable future residential, commercial and industrial demand and growth. [*Glenview Dev. Co. v. Franklin Township,* 164 *N.J.Super.* 563, 567–68, 397 *A.*2d 384 (Law Div.1978) (quoting *Mount Laurel* I, *supra,* 67 *N.J.* at 160, 336 *A.*2d 713).]

Eight years later, in *Mount Laurel* II, we confronted "widespread non-compliance with the constitutional mandate" of *Mount Laurel* I. 92 *N.J.* at 199, 456 *A.*2d 390. We reconsidered the effectiveness of the "developing municipality" methodology and found several "drawbacks" to that approach. *Id.* at 224, 456 *A.*2d 390. First, we noted the uncertainty faced by certain municipalities in not knowing "without question whether [they are] subject to the *Mount Laurel* remedy * * *." *Ibid.* In addition, the "developing municipality" criteria presented planning problems for other municipalities, because there might be instances in which "prime agricultural land, open spaces and areas of scenic beauty" should not yield to the "inevitable" demands of commercial and industrial growth. *Ibid.* Thus, we concluded that the "developing municipality" approach "furnished no guarantee that if lower income housing resulted, it would be built where it should be built, *i.e.,* where a comprehensive plan for the State of New Jersey might indicate such development was desirable." *Id.* at 225, 456 *A.*2d 390. We therefore authorized reliance on the SDGP, "the only official determination of the state's plan for its own future development and growth." *Ibid.*

Created by statutory directive, see *N.J.S.A.* 13:1B–15.52(a)(2) (repealed by *N.J.S.A.* 52:18A–199), the SDGP discussed a variety of factors related to New Jersey's growth and development, including population distribution, natural resources, infrastructure, and the economy. 92 *N.J.* at 225, 231, 456 *A.*2d 390. The Division of State and Regional Planning in the Department of Consumer Affairs reviewed those criteria and released the

SDGP in May 1980 "as a blueprint for the implementation of the *Mount Laurel* doctrine." *Id.* at 226, 456 *A.*2d 390.

Under the Plan, each municipality is effectively classified as falling within one of six designated areas. We imposed a *Mount Laurel* obligation only on those municipalities containing a "growth" area as shown on the SDGP concept map. *Id.* at 226, 236, 456 *A.*2d 390. The size of the growth area then became a factor in determining the municipality's "fair share" obligation for that region. We observed that the SDGP promoted sound statewide planning because it "ensure[s] that the imposition of fair share obligations will coincide with the State's regional planning goals and objectives." *Id.* at 225, 456 *A.*2d 390.

At the same time, however, we expressed concern about the use of the SDGP as the exclusive determinant of a municipality's *Mount Laurel* obligation:

> Our reluctance to give [the SDGP] conclusive effect is based on the fact that while it has the legitimacy of legislative authorization, the Legislature has neither explicitly authorized its use for *Mount Laurel* purposes nor mandated that the actual use of land, as permitted in zoning ordinances, conform to the SDGP. Given these circumstances, we deem it prudent to allow parties to attempt to persuade the trial court, in a particular case, that the SDGP should not determine whether the *Mount Laurel* doctrine applies to the particular municipality involved in the case. [*Id.* at 239, 456 *A.*2d 390.]

We established three ways in which a *Mount Laurel* litigant could prove that the locus of the *Mount Laurel* obligation varied from the growth area designated by the SDGP. *Id.* at 240–41, 456 *A.*2d 390. Only the third method is implicated here. That exception could be invoked if the SDGP concept map was not revised by January 1, 1985, and if a municipality "contains some 'growth area,' [but] encourages or allows development outside of that area." [2] *Id.* at 241, 456 *A.*2d 390. We permitted

---

[2]The exception also applies to municipalities with no growth area that encourage or permit commercial, residential, or industrial development. *Id.* at 240–41, 456 *A.*2d 390.

challenges to the "growth area" designation in those municipalities because we believed that

> if the planning process does *not* remain a continuing one, the categories set forth in the SDGP might become unrealistic and certainly would lose a considerable degree of their legitimacy. It is one thing for a court to defer to the judgment of the planners, even where it disagrees; it is another to defer to a document that is clearly out of date where a deferral might frustrate a constitutional obligation. In order for it to remain a viable remedial standard, we believe that the SDGP should be revised no later than January 1, 1985 (and, in the absence of proof of a more appropriate period, every three years thereafter). If it is not, then courts shall have considerable discretion to vary the locus of the *Mount Laurel* obligation from that shown on the present SDGP concept map. [*Id.* at 242, 456 *A*.2d 390 (footnote omitted).]

The enactment of the Fair Housing Act in July 1985 represented the Legislature's response to the *Mount Laurel* problem. To satisfy the constitutional mandate, the Act recognized that "[t]he interest of all citizens * * * would be best served by a comprehensive planning and implementation response" to the *Mount Laurel* obligation. *N.J.S.A.* 52:27D–302c.

In January 1986, the Legislature repealed the SDGP, *L.*1985, *c.* 398, § 18, declaring that "[i]t is of urgent importance that the State Development Guide Plan be replaced by a State Development and Redevelopment Plan designed for use as a tool for assessing suitable locations for infrastructure, housing, economic growth and conservation." *N.J.S.A.* 52:18A–196c. The SDRP is intended to further many objectives besides *Mount Laurel* housing, including the protection of New Jersey natural resources, *N.J.S.A.* 52:18A–200a, the development of land "in a manner consistent with sound planning * * *," *N.J.S.A.* 52:18A–200b, and the establishment of statewide planning objectives in areas such as transportation, farmland retention, and historic preservation. *N.J.S.A.* 52:18A–200f.

The Legislature required the State Planning Commission to prepare and adopt the SDRP by July 2, 1987. *N.J.S.A.* 52:18A–199a. That time limitation was extended until January 2, 1989. *Ibid.* The SDRP has still not been adopted, however, "although it is expected that this will be accomplished in 1993." *Van Dalen, supra,* 232 *N.J.Super.* at 210, 556 *A*.2d 1247.

It is in that context that COAH adopted a variety of regulations to administer its statutory delegation of authority. See *N.J.A.C.* 5:92–1.1 to –12.18. The regulations make clear that the Council intends to rely exclusively on the SDGP to determine the location and size of growth areas until the SDRP has been adopted. *See, e.g., N.J.A.C.* 5:92–1.3 (" 'Growth Area' means the lands so designated by the 1980 State Development Guide Plan as updated by the State Development [and] Redevelopment Plan. 'State Development Guide Plan (SDGP)' means the officially recognized State plan for development * * *.").

Based on the SDGP, COAH determines where growth areas exist, which the Council then uses as a factor in allocating a municipality's fair-share obligation. Those determinations also become important for COAH in deciding whether to grant a municipality's petition for substantive certification. See *N.J.S.A.* 52:27D–314.

In making those decisions, COAH acknowledges that the SDGP does not always reflect the most recent growth trends for every municipality. The Council emphasizes, however, that the SDGP represents the most current statewide-planning document available and that COAH will reevaluate each municipality's *Mount Laurel* obligation when the SDRP has been released. COAH argues that until that time, its continued reliance on the SDGP is a reasonable exercise of agency discretion, and that deference to that decision is warranted.

### III.

Our review of an administrative agency's action is limited in scope. *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n,* 93 *N.J.* 384, 390, 461 *A.*2d 575 (1983). We will not substitute our judgment for that of the agency unless the action is arbitrary or capricious. *Newark v. Natural Resource Council,* 82 *N.J.* 530, 539, 414 *A.*2d 1304, *cert. denied,* 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980). Moreover, an administrative agency's exercise of statutorily-

delegated responsibility is accorded a strong presumption of validity and reasonableness. *Ibid.* The presumption is even stronger when the agency has been delegated discretion to determine the specialized procedures for its tasks. *Id.* at 540, 414 *A.*2d 1304 (citations omitted).

■ Van Dalen concedes that COAH can use the SDGP to help determine a municipality's *Mount Laurel* obligation. He argues, however, that the SDGP is not sufficiently reliable to be used as the exclusive criterion for determining the location and size of growth areas. Specifically, Van Dalen claims that COAH's "rigid" adherence to the SDGP is unreasonable because information contained in the SDGP is outdated. In addition, he maintains that neither the Legislature nor this Court has ever approved the SDGP as the sole determinant of the *Mount Laurel* obligation. Finally, Van Dalen asserts that the repeal of the SDGP by the Legislature demonstrates that its continued use by COAH is improper.

The Appellate Division found that Van Dalen's claims presented "[f]actual questions concerning delineation of defendant's growth area," *Van Dalen, supra,* 232 *N.J.Super.* at 211, 556 *A.*2d 1247, and remanded the matter for an evidentiary hearing. We disagree with that disposition because of the broad discretion that must be afforded COAH in the exercise of its statutory duties.

The grant of authority to an administrative agency should be liberally construed to enable the agency to accomplish the Legislature's goals. *Gloucester, supra,* 93 *N.J.* at 390, 461 *A.*2d 575 (citation omitted). The Fair Housing Act delegated the authority for its administration to COAH, see *N.J.S.A.* 52:27D–307, and provided the Council with broad powers. *Hills Dev. Co., supra,* 103 *N.J.* at 32, 510 *A.*2d 621.

One such power involves the certification process. The Council may use its powers to grant or deny substantive certification in a "multitude of ways" in order to achieve statewide compliance with the *Mount Laurel* obligation. *Id.* at 56, 510 *A.*2d

621. We have recognized the *"variety of methodologies* that can be used legitimately to determine regional need and fair share as well as the *many different ways* in which a realistic opportunity to achieve that fair share may be provided." *Id.* at 35, 510 *A.*2d 621 (emphasis added).

We are satisfied that deference to COAH's reliance on the SDGP is especially appropriate because the agency is charged with the implementation of the Fair Housing Act, a new and innovative legislative response to deal with the statewide need for affordable housing. *Newark Firemen's Mut. Benevolent Ass'n v. Newark,* 90 *N.J.* 44, 55, 447 *A.*2d 130 (1982). Because the legislative scheme is novel, the implementation of its goals is necessarily an evolving process. Accordingly, COAH is entitled to a reasonable degree of latitude, consistent with the legislative purpose, in its effort to ascertain which planning and statistical studies best serve the long-term statutory objectives.

We recognize that the SDGP is not the optimal tool for determining the locus and extent of a municipality's *Mount Laurel* obligation. We have no doubt that COAH is also aware of the SDGP's limitations. The pragmatic reality is that its replacement has not been completed. In the interim, COAH's apparent options are to use the Guide Plan exclusively, or to use it in conjunction with other *ad hoc* evidence. To the extent that the latter approach would require a recalculation of Washington Township's growth area, with its eventual impact on the municipality's fair-share obligation, that process could have a ripple-like effect on other communities within that region. Thus, COAH may reasonably have concluded that for the time being the advantages of easy administration and stability in the planning process afforded by the SDGP outweigh the possibly greater precision that could accrue from a more flexible planning formulation.

Hence, we cannot conclude that COAH's decision to rely on the SDGP constituted an unlawful or arbitrary exercise of its statutory authority. Nothing before us indicates that COAH's

reliance on the SDGP has distorted the statewide allocation of affordable housing. As with other analogous governmental processes, such as legislative reapportionment and property revaluations, the method of allocating affordable housing throughout the state should be adjusted periodically to reflect demographic changes. That requirement suggests that the agency's allocation formula need not be precise, but it must be reasonable. *Cf. Texter v. Department of Human Servs.*, 88 *N.J.* 376, 389–90, 443 *A.*2d 178 (1982) (remanding to Commissioner of Human Services for reconsideration of eligibility standards for Medical Assistance for the Aged not adjusted for inflation since promulgated in 1963).

Of course, continued delay in the completion of the SDRP may in the future affect the reasonableness of COAH's use of the SDGP. We assume that COAH's continued reliance on the SDGP will be sufficiently flexible so as to permit the presentation of proofs demonstrating that the allocation of affordable housing on the basis of the SDGP may be flawed either statewide or in particular regions. If the Council determines to discontinue exclusive reliance on the SDGP, either generally or in a particular region or municipality, it is required to determine the statutory fair-share obligation on the basis of other sound planning criteria.

In addition to questioning COAH's use of the SDGP, Van Dalen claims that he is entitled to a builder's remedy. We first considered the availability of a builder's remedy in *Oakwood at Madison v. Township of Madison*, 72 *N.J.* 481, 371 *A.*2d 1192 (1977). Because many municipalities would not voluntarily comply with the mandate of *Mount Laurel*, we created "an incentive for institution of socially beneficial but costly litigation such as *Mount Laurel* [to] serve the utilitarian purpose of getting on with the provision of needed housing for at least some portion of the moderate income elements of the population." *Id.* at 550–51, 371 *A.*2d 1192. That incentive permitted a builder, in the appropriate case, to obtain

a permit for the development on their property of the housing project they proposed to the township prior to or during the pendency of the action, pursuant to plans which, as they originally represented, will guarantee the allocation of at least 20% of the units to low or moderate income families. [*Id.* at 551, 371 *A.*2d 1192 (footnote omitted).]

We noted, however, that "[s]uch relief will ordinarily be rare, and will generally rest in the discretion of the court, to be exercised in the light of all attendant circumstances." *Id.* at 551–52 n. 50, 371 *A.*2d 1192.

In *Mount Laurel* II, *supra,* 92 *N.J.* 158, 456 *A.*2d 390, we expanded the availability of builder's remedies because our "[e]xperience since *Madison* * * * has demonstrated to us that builder's remedies must be made more readily available to achieve compliance with *Mount Laurel.*" *Id.* at 279, 456 *A.*2d 390. Thus, we held in *Mount Laurel II* that

[b]uilder's remedies will be afforded to plaintiffs in *Mount Laurel* litigation where appropriate, on a case-by-case basis. Where the plaintiff has acted in good faith, attempted to obtain relief without litigation, and thereafter vindicates the constitutional obligation in *Mount Laurel*-type litigation, ordinarily a builder's remedy will be granted, provided that the proposed project includes an appropriate portion of low and moderate income housing, and provided further that it is located and designed in accordance with sound zoning and planning concepts, including its environmental impact. [*Id.* at 218, 456 *A.*2d 390.]

We also observed, however, that "[t]rial courts should guard the public interest carefully to be sure that plaintiff-developers do not abuse the *Mount Laurel* doctrine." *Id.* at 281, 456 *A.*2d 390.

The Fair Housing Act, enacted almost three years after *Mount Laurel II* was decided, expressed the Legislature's concern about the availability of a builder's remedy:

The Legislature declares that the State's preference for the resolution of existing and future disputes involving exclusionary zoning is the mediation and review process * * * and not litigation, and that it is the intention of this act to provide various alternatives to the use of the builder's remedy as a method of achieving fair share housing. [*N.J.S.A.* 52:27D–303.]

We examined the constitutionality and effect of the Fair Housing Act in *Hills Dev. Co., supra,* 103 *N.J.* 1, 510 *A.*2d 621. In upholding the Act, we discussed the impact on a builder resulting from the transfer of all *Mount Laurel* litigation to COAH. We were well aware that builders were "expected" to

commence *Mount Laurel* suits, given the incentive provided in *Mount Laurel II. Id.* at 54–55, 510 *A.*2d 621. Yet, we observed that a builder's remedy was not the type of judicially-created relief intended to be permanent:

> [T]here is an obvious basis to a builder's claim that pursuit of this litigation was justifiable, but if that suggestion is intended to create the image of an estoppel, there is no substance to it. If there is any class of litigant that knows of the uncertainties of litigation, it is the builders. They, more than any other group, have walked the rough, uneven, unpredictable path through planning boards, boards of adjustments, permits, approvals, conditions, lawsuits, appeals, affirmances, reversals, and in between all of these, changes in both statutory and decisional law that can turn a case upside down. No builder with the slightest amount of experience could have relied on the remedies provided in *Mount Laurel* II in the sense of justifiably believing that they would not be changed, or that any change would not apply to the builders. If ever any doctrine and any remedy appeared susceptible to change, it was that decision and its remedy. The opinion itself constituted the strongest permissible entreaty for legislative change. [*Id.* at 55, 510 *A.*2d 621.]

Given the limited availability of a builder's remedy under the Fair Housing Act, we find no evidence in the record indicating that Van Dalen is entitled to such relief. We also conclude that there is insufficient proof in the record to support the claim that Washington Township would not have satisfied its *Mount Laurel* obligation unless Van Dalen had commenced this action. See *id.* at 36, 510 *A.*2d 621 (observing that "what appears at first to be simply an option available to municipalities is more realistically a procedure that practically all municipalities with a significant *Mount Laurel* obligation will follow * * * "). Accordingly, we conclude that both COAH and the Appellate Division properly denied Van Dalen a builder's remedy.

The judgment of the Appellate Division is affirmed in part and reversed in part.

WILENTZ, C.J., and CLIFFORD, HANDLER, POLLOCK, O'HERN, and GARIBALDI, JJ., join in this opinion.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ, and JUSTICES CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.